[L. A. No. 18710.   In Bank.   Dec. 27, 1943.]

RICHARD C. W. FRIDAY, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Richard C. W. Friday in pro. per., for Petitioner.

Philbrick McCoy, Norman S. Sterry and Gibson, Dunn & Crutcher for Respondent.

CARTER, J.—The Board of Governors of The State Bar recommends the suspension of petitioner from the practice of law for six months and that, before he may be permitted to resume practice, he be required to take and pass the examination given to attorneys from other states seeking admission to practice in this state.

The local administrative committee found that petitioner solicited employment in his professional capacity from Jean Mackenzie, who at the time was represented by another attorney.

Jean Mackenzie had a claim for $639 against the estate of Gil-

bert E. Gould, deceased, and possibly against one of the heirs of the deceased. In April, 1942, she consulted Mr. Theodor Ira Kowan, an attorney at law, with reference to the claim and employed him to collect it for her. The claim was prepared by Kowan, signed by Mrs. Mackenzie and filed by Kowan in the estate proceeding. It was stated therein that Kowan was attorney for Mrs. Mackenzie, the claimant. According to the testimony of Mrs. Mackenzie, she met petitioner on the street about the middle of June, 1942, and he spoke to her about her claim against the estate; that a few days thereafter he sent her a postal card, the contents of which she remembered although the card was lost, in which he stated: ''I have looked into your case on the records. Just twenty-four hours to save your case. Come to my office at once.'' She went to petitioner's office and was advised that he would charge $35 to collect the claim, that her lawyer (Kowan) had done nothing on the case, was not alert or active in the case, and that she should pay him $10. A few days thereafter, she called at his office again, paid him $10 and signed a complaint prepared by petitioner for instituting an action on the claim. The verification by Mrs. Mackenzie bears the date of and the action was filed by petitioner June 16, 1942. On June 25 and 27, 1942, petitioner sent cards to Mrs. Mackenzie discussing the claim, in the former of which he said he had again further examined the probate file in the Gould estate. Mrs. Mackenzie then consulted Kowan with reference to the matter. The latter questioned petitioner concerning how he came into the case, first by telephone, and petitioner refused to discuss the matter. In response to a letter from Kowan, petitioner suggested that Kowan discuss the matter with the ''man in the moon.'' Thereafter petitioner at first refused but later consented to the substitution of Kowan as attorney in the action on the claim. Thereafter petitioner commenced an action against Kowan and Mrs. Mackenzie for attorney's fees allegedly due him for his services in connection with the claim.

Mrs. Mackenzie testified that she advised petitioner that she was represented by Kowan before he filed the action on the claim. The record shows: ''Q. In any of those conversations you had with Mr. Friday did you explain to him you had Theodor Ira Kowan as your attorney or not? A. I explained to him in his office one day that I already had an attorney, when he first asked me for the case. Mr. Drumm: Q. Can you state definitely whether your conversation with him with regard to

Mr. Kowan was prior or subsequent to the signing of the complaint in his office? A. It was prior because when he asked me for money I told him that I had already paid a lawyer a retaining fee and I had engaged this lawyer. I felt guilty about paying him anything, and I told him I had a lawyer.'' Petitioner testified that he examined the probate file and the claim filed therein by Kowan about May 30, 1942, and about three times between May 28, 1942, and the commencement of the action thereon by him on June 16, 1942; and that he saw Kowan's name thereon as attorney for Mrs. Mackenzie.

The foregoing evidence clearly indicates that the local administrative committee was justified in its finding. Petitioner urges that Mrs. Mackenzie consulted several other lawyers and the public administrator; that she came to him concerning the claim; that a substitution of attorneys was not necessary on the probate claim; and that Mrs. Mackenzie was satisfied with his services. It also appears that Mrs. Mackenzie had a casual acquaintance with petitioner before the occurrence of the instances here related. Nevertheless, the evidence clearly indicates that petitioner solicited the legal business from Mrs. Mackenzie and continued to press his representation of her, even to the point of commencing the action on the claim although he knew that Kowan was representing her in the matter. He did not contact Kowan in regard to the matter, or suggest to Mrs. Mackenzie that she discharge him. He represented that Kowan was not protecting her interests, whereas the answer filed by the representative of the Gould estate to the action filed by Kowan on the claim concedes the validity of all the procedural steps. The case presented has factors additional to those present in *Ewell* v. *State Bar*, 2 Cal.2d 209, 220 [40 P.2d 264], where it was said: ''We are of the view, however, that the accused should not have relied had been provided for him in view of the fact that an attorney merely upon the word of Rutherford as to whether an attorney had represented him at the preliminary. Although it does not so appear from the record in express language, it should have occurred to the accused that it was likely that arrangements for retaining Mr. O'Donnell to represent Rutherford at subsequent proceedings had not been concluded and that it was because of pending negotiation with Miss Corville that Mr. O'Donnell had not made definite announcement as to whether he would continue as his attorney. In other words, the ac-

cused should, under the circumstances, have communicated with Mr. O'Donnell and obtained definite information on the subject before he assumed to advise Rutherford. His act no doubt constituted an infraction of the rules providing for the improvement of the practice of the law.''

For the foregoing reasons petitioner should be suspended from the practice of law for six months, as recommended.

■ There is nothing in the State Bar Act conferring authority upon the Board of Governors to recommend discipline for lack of legal learning, as a general charge. Nor does the board have power to recommend the discipline of an attorney for a deficiency in legal knowledge when such deficiency is the gravamen of the charge of specific misconduct with relation to a client. The only cause for discipline which would appear to be a basis for such a charge is a violation of the oath taken by the attorney, or of his duties as such attorney. (Bus. & Prof. Code, sec. 6103.) The oath of an attorney pledges him ''faithfully to discharge the duties of any attorney at law to the best of his knowledge and ability.'' (Bus. & Prof. Code, sec. 6067.) In other words, he must perform his duties to the best of *his individual* ability, not the standard of ability required of lawyers generally in the community.

■ Mere ignorance of the law in conducting the affairs of his client in good faith is not a cause for discipline. The nearest approach to such conduct is negligence as a ground for discipline when the neglect is so serious as to constitute a violation of his oath as an attorney. (See *Trusty* v. *State Bar,* 16 Cal.2d 550 [107 P.2d 10]; *Marsh* v. *State Bar,* 210 Cal. 303 [291 P. 583]; *Marsh* v. *State Bar,* 2 Cal.2d 75 [39 P.2d 403]; *Waterman* v. *State Bar,* 8 Cal.2d 17 [63 P.2d 1133]; *Stephens* v. *State Bar,* 19 Cal.2d 580 [122 P.2d 549]; *Bruns* v. *State Bar,* 18 Cal.2d 667 [117 P.2d 327].) Conduct of that character, however, embraces more than mere ignorance of the law, as is evident from its nature. Certainly an act committed because of mere ignorance does not constitute moral turpitude.

A recommendation that petitioner be required to pass the examination given to attorneys admitted to practice in other states as a condition to their admission in this state before he may resume practice at the end of the six months' suspension period, is a matter of serious import. The State Bar Act (Bus. & Prof. Code, secs. 6000-6154) does not author-

ize the Board of Governors of The State Bar to make such a recommendation. The board has the powers and duties conferred by the State Bar Act (Bus. & Prof. Code, sec. 6010). It may formulate and enforce rules of professional conduct with the approval of the Supreme Court (Bus. & Prof. Code, sec. 6076). For a willful breach of such rules a member of The State Bar may be disciplined by *reproval* or *suspension* from the practice of law for not exceeding one year. (Bus. & Prof. Code, sec. 6077.) The board, for any of the causes set forth in the laws of the state, has power to recommend to the Supreme Court *disbarment, suspension, or private or public reproval.* (Bus. & Prof. Code, sec. 6078.) The clear indication from these provisions is that the board has no power to recommend other than disbarment, suspension or reproval. Other provisions of the act authorize the giving of examinations bearing upon the legal learning and qualifications of an attorney as a basis for a recommendation (Bus. & Prof. Code, secs. 6046, 6060, 6062), but they deal with admission to practice in this state in the first instance. The board has power to make recommendations with regard to reinstatement of attorneys after disbarment. (Bus. & Prof. Code, sec. 6078.)

■ While an attorney shall not practice law while suspended or disbarred, the statute does not require that his name be stricken from the roll of attorneys except in the case of disbarment. (Bus. & Prof. Code, sec. 6117.) At the end of the period of suspension, he may again practice without any order of reinstatement.

■ Respondent argues, however, that regardless of what may be the authority of the Board of Governors, this court has the power to require the passing of the examination as a prerequisite to resumption of practice after suspension. A requirement that an attorney pass an examination to test his knowledge of the law once he has been admitted to practice in this state might arise in three situations, namely, that he could be disbarred upon a charge that he lacks the necessary legal qualifications; that he could be compelled to pass the examination before being entitled to resume practice after his suspension; and that passing such an examination is a prerequisite to reinstatement after disbarment. While it has been said that this court has inherent power in the matter of disciplining attorneys and legislative enactments are in aid of and not a limitation upon that power (*In re Lavine,* 2 Cal.2d

324 [41 P.2d 161, 42 P.2d 311] ; *Johnson* v. *State Bar,* 4 Cal.2d 744 [52 P.2d 928] ), it is significant that the Legislature has not seen fit to require an examination in any of those above-mentioned circumstances. Assuming that this court has the power to compel periodic examinations of persons admitted to practice, or to require the passing of an examination upon a general charge of lack of legal attainments unrelated to conduct involving a particular client, it should certainly not be exercised in a case such as this where the charge is solicitation of legal business and the discipline a six-months' suspension from practice. Nor will it impose disciplinary measures for specific transactions between an attorney and client, where the charge of misconduct consists of nothing more than a lack of that degree of legal acumen which this court might think an attorney should possess. The same conclusion must be reached in regard to imposing the requirement as a condition to resumption of practice after suspension whatever may have been the cause for such suspension. Any other conclusion would be arbitrary and would result in neither credit to the bar nor benefit to the public. It cannot be doubted that erudition in law on the part of the legal profession is something to be fostered and achieved. Yet the interests of the public and the profession will not be served by a policy which disturbs the stability and dignity of the profession or makes insecure the position of the members thereof. Attorneys who have been admitted to practice in this state presumably have been found to possess those educational and intellectual attainments necessary for the protection of the public. Since the organization of the bar as an integrated group, careful and comprehensive measures have been taken to insure the admission to practice of only those persons who are duly qualified. Prior to that time a procedure was followed which was less elaborate but which embraced the factor of personal contact not now possible because of the number of applicants seeking admission. (See *In re Admission to Practice Law,* 1 Cal.2d 61, 68-69 [33 P.2d 829].)

It would be discriminatory and unfair to require the passing of an examination as a prerequisite to continuation in practice of those admitted to practice, either on a charge of lack of legal ability or as a condition to the resumption of practice after suspension. To impose that obligation upon those few attorneys who were so unfortunate as to have such a charge made against them, or have erred in their conduct,

but not upon others, would result in destroying the dignity of the profession and undermining the confidence of the public therein. Every disgruntled client whose case was lost would be inclined to charge that his counsel lacked ability, when it is . obvious that there are two sides to every case. One side is wrong either because the trier of fact was not convinced or the legal theory relied upon was incorrect. Merely because an attorney has been disciplined for some infraction of the rules by which he must abide is no reason for assuming that he is not a qualified and efficient lawyer. Erring morally or by breach of professional ethics does not necessarily indicate a lack of knowledge of the law.

It is urged that the admission to practice is based upon a finding of a good moral character as well as the necessary legal ability, and disciplinary measures may be taken for the loss of the former. There is a substantial difference. A good moral character is a general but it is not an invariable quality. Events and conditions subsequent to admission may so influence an individual that he will commit an act or a series of acts which are subject to condemnation. Whether he possesses the proper moral character at the time of his admission is largely a matter of opinion, and the course of his future conduct is a matter of the intrinsic strength of his moral fiber, a condition which is not possible of exact measurement. Some specific act of unmoral conduct must be the basis of discipline. In respect to legal learning it is assumed that once he is found to possess it he continues to have it. As we have seen, no mere charge of an act or a series of acts showing ignorance of the law is ground for discipline. Nor should the requirement of passing an examination be imposed where he has been disciplined for some specific improper conduct.

▮ It is suggested that this court has imposed conditions as a prerequisite to the resumption of practice after suspension, referring to *In re Tyler*, 71 Cal. 353 [12 P. 289, 13 P. 169], and *In re Soale*, 31 Cal.App. 144 [159 P. 1065], involving the condition of restoration of clients' funds, and *In re Philbrook*, 105 Cal. 471 [38 P. 511, 884, 45 Am.St.Rep. 59], imposing a suspension for three years and until further order of the court. Whatever may be the propriety of those conditions, a matter upon which we express no opinion, it does not follow that the passing of an examination may be imposed as such a condition. Such a condition is neither fair nor rea-

sonable and lacks the essential pertinency to the misconduct involved.

There have been cases in which it has been intimated that an applicant for reinstatement after disbarment may be required to pass an examination before he may be restored to practice. *In re Stevens,* 197 Cal. 408 [241 P. 88], involved an application for reinstatement after disbarment. It was held that although an application for reinstatement was in some respects the same as an application for admission in the first instance, the statutory law on the latter subject did not control; that it had not been the practice theretofore to require reexamination of the applicant's mental qualifications, citing *In re Application of John S. Delancey* and *In the Matter of Hatch,* reported in the Minutes of the Supreme Court of August 9, 1920, and September 20, 1920, respectively; *Danford* v. *Superior Court,* 49 Cal.App. 303 [193 P. 272]; *Bar Assn. of S. F.* v. *Cantrell,* 53 Cal.App. 758 [200 P. 968]; *In re Hahn,* 56 Cal.App. 702 [206 P. 473]; *In re Stevens,* 63 Cal.App. 682 [219 P. 1014]; and *In re O'Connell,* 64 Cal.App. 673 [222 P. 625]. In commenting upon *Danford* v. *Superior Court,* *supra,* the court stated (*In re Stevens, supra,* 197 Cal. at p. 424): "The Danford case holds, as already indicated, that an application for restoration must be treated as an application for original admission and as such must be addressed to the court having jurisdiction to admit to practice in the first instance. Our conclusion is that the Danford case is in *error* in two particulars—first, in holding that such an *applicant is in the same position as one seeking original admission;* and, second, in declaring that this principle was laid down in the Mash case. *It follows that the implication of the Danford case that the applicant for restoration to practice must submit to a re-examination is also erroneous.* In any event, it is proper to say that *we are not prepared in the absence of legislative expression to accept the conclusion that every applicant for restoration to practice must submit to a re-examination as to his mental qualifications.* No adequate reason occurs to us for making the rule invariable. The law is interested in the regeneration of erring attorneys, and in the enforcement of a sound discipline its disposition ought not to be to place unnecessary burdens upon them." (Emphasis added.) While the court goes on to say that the question of re-examination upon reinstatement rests in the sound discretion of the court,

we believe that holding should be limited to the bare proposition that the court has such power, but that it will not be exercised except possibly in rare or unusual cases. ■ But even conceding that the re-examination of a disbarred attorney may be required in proper cases, no such requirement should be invoked in cases of mere suspension of an attorney from practice, as a suspended attorney is still a member of the bar, but his right to practice is suspended for a limited period. When such period expires he may resume practice without obtaining an order of this court or other authorization permitting him to do so.

In view of the conclusion herein reached, it is not necessary to review the claim that petitioner's conduct indicates a lack of the requisite mental qualifications. Suffice it to observe that his conduct during the hearing before the local administrative committee was far from commendable. It approached, if not reached, an attitude of contempt. It was rude and unbecoming of a member of the legal profession. While petitioner's written presentation of his case and his correspondence are barely comprehensible at times, it may well arise from an unusual or odd sense of humor, "wise-cracking," and extreme facetiousness, rather than a lack of knowledge of the law.

Petitioner is suspended from the practice of law for six months, this order to become effective thirty days from the filing of this decision.

Shenk, J., Curtis, J., and Schauer, J., concurred.

Traynor, J., concurred in the judgment.

GIBSON, C. J.—I concur in the conclusion that petitioner should be suspended from the practice of law for a period of six months, based on evidence showing solicitation of business. I also concur in the conclusion that it is improper to require that petitioner's suspension be continued beyond such six months' period and until such time as he shall have taken and passed the examination given to attorneys from other states seeking admission to practice here. Although an attorney may not practice law while suspended, the statute does not require that his name be stricken from the roll of attorneys. (State Bar Act, sec. 6117.) He at all times re-

mains a member of the bar though under temporary disability. At the end of the definite period of suspension petitioner would be entitled to again practice law without further order of this court or any other body. This conclusion, of course, is directed to the factual situation presented by a suspension as distinguished from a disbarment. Upon disbarment the name of the attorney is required to be stricken from the roll of attorneys. (State Bar Act, sec. 6117.) He ceases to be a member of the bar, and the disability resulting from disbarment is complete and permanent unless removed by an order of this court directing reinstatement. It is unnecessary in this proceeding to express any view as to the cases in which this court, under its inherent power, might require an examination as to legal learning of disbarred attorneys seeking reinstatement. (See In re *Stevens*, 197 Cal. 408-425 [241 P. 88].)

Edmonds, J., concurred.